REAM v. ROBINSON.

1. TENANCY IN COMMON—FORECLOSURE—PURCHASE BY CO-TEN-
   ANT—RIGHTS OF PARTIES.
       A purchase by a tenant in common of the common property at
       foreclosure sale inures to the benefit of his co-tenants, though
       he did not acquire his original interest jointly with them,
       and was not in possession at the time of the sale.

2. SAME—ACCOUNTING—APPEAL.
       Evidence reviewed, and *held* to establish the claim that a con-
       veyance by defendant to his son was antedated, to enable
       defendant to escape his accountability to complainants as a
       tenant in common with them; and the rights of the several
       parties were adjusted on the basis of the existence of that
       relationship.

Appeal from Newaygo; Palmer, J. Submitted June
5, 1901. Decided July 19, 1901.

Bill by Etta Ream and Daniel Boyden against Issachar
N. Robinson, Albert M. Robinson, and Rachel Holbrook
to set aside a deed, and for an accounting and a partition.
From a decree dismissing the bill, complainants appeal.
Reversed.

*F. W. Cook* (*Martin Rozema*, of counsel), for com-
plainants.

*George Luton*, for defendant

HOOKER, J. In 1871 David W. Boyden died intestate,
leaving a farm of 27 acres to his three children, Etta
Ream, David W. Boyden, and Daniel Boyden, subject to
the rights of his widow, their mother. In 1880 the widow,
now Rachel Holbrook, as administratrix of her deceased
husband's estate and in her own right, mortgaged the
premises for $275. On December 2, 1897, defendant
Issachar N. Robinson obtained an assignment of this

mortgage to one Julia M. Rice, for whom he was, and for some time had been, acting as agent. On October 5, 1891, there was due on this mortgage the sum of $460, and upon that day Etta Ream paid $60 upon it, and on April 26, 1892, she paid $80, and on June 5, 1893, $30 more, making a total of $170 paid by her. David W. Boyden paid $45 upon it. Daniel paid nothing. Mr. Norton, a tenant, paid $136 to apply on the mortgage and interest. At the time Julia M. Rice bought it, the complainants claim that there was but $232 due upon it, and that Etta Ream had paid more than one-third of the mortgage, and interest computed to the time of hearing this cause in the circuit court.

On December 24, 1897, defendant Issachar N. Robinson bought the interest of David W. Boyden for $75. This was 22 days after he took an assignment of the mortgage to Julia M. Rice. About three weeks later he began foreclosure proceedings by advertisement, using, by permission, the name of another as attorney, but attending to the business himself, and at the sale bid the property in for himself. Immediately after bidding in the property, he wrote the following letter to Mrs. Ream:

"FREMONT, MICH., April 19, 1898.

"MRS. REAM: That mortgage on the 40 acres in which you hold an interest was foreclosed, and I bid in the land, and if you wish to give me a quitclaim deed for $75, the same that I paid your brother David, I will give you that amount. I have talked with your brother Daniel, and he says he will sell his interest for the $75 if you wish to sell yours. The land is in very poor shape, and has so many milkweeds on it, and continual cropping and not putting anything back has made it in very poor shape, so this is all I feel that I can afford to pay.

"Very respectfully,

"I. N. ROBINSON."

Mrs. Ream then employed an attorney, and negotiations extending over some months ensued. Being unwilling to sell for $75, she tried to buy his interest for a similar sum, and finally offered him $125 for it. Although it had cost

him but $75, he refused to accept it, and, although he now pretends to have parted with his title, he was careful not to inform her or her attorney that he did not own it. A few days before the redemption would expire, Mrs. Ream's attorney learned that she had paid more than one-third of the amount due on the mortgage, and, the deed from David W. Boyden to Issachar N. Robinson being of record, he asserted to Robinson that his foreclosure title inured to her benefit, because they were tenants in common. He testified that he told Robinson that, if he wanted to cut her off, he should have had the purchase at the mortgage sale made by some one else. According to the witness, he did not deny his ownership of the David W. Boyden interest, and finally offered $100 for Mrs. Ream's interest, as a present. The witness testified that he said that he still owned it, in answer to the direct question. A day or two before the expiration of the period for redemption, a quitclaim deed of an undivided third of the premises was presented, with the request that he execute it. This he refused. Thereupon a bill of complaint was filed, and on May 13th or 14th an answer was filed, alleging that Robinson had quitclaimed his interest to his son, about 10 days after he bought from David W. Boyden, for $100 in cash. Thereupon complainants withdrew the suit, and filed the bill in this case, asking that the quitclaim deed to the son be declared void and set aside, and that an account be taken between the tenants in common, and that payment be decreed and partition had. Both Robinson and son answered.

A part of complainants' testimony has been stated. This is corroborated by the testimony of Mrs. Ream; also by that of Mr. Johnston, to whom Issachar said, in April, 1899:

"I don't know what real claim they have on me to pay on this matter, because I have bought the mortgage, and I already hold one-third interest in the property; but I will make her a present of a hundred dollars."

The register of deeds testified that on May 3, 1899, the

deed was recorded; that, a short time before, he had a talk with Issachar N. Robinson about the land that had been foreclosed, and was told by him that he owned a third of it; that he told him he had made a mistake in bidding it in, inasmuch as he was a tenant in common. Robinson told him nothing about the deed to Albert at that time. The examination continued as follows:

" *Q.* Didn't he, while he was there, say something to you relative to the feasibility or the idea of executing a quitclaim deed to his son, or to somebody, of the one-third interest, and getting a deed back?

" *A.* Not that I remember of.

" *Q.* Don't you remember a remark of that kind by him?

" *A.* No; I don't think I do.

" *Q.* Haven't you any recollection of that? Something of that nature was said by one or the other of you?

" *A.* Well, I wouldn't want to swear to it. There possibly might have been something said in that direction. To the best of my memory, I think there was a little something said about it, but I wouldn't want to be— I wouldn't want to swear to it, but to the best of my recollection there was something said about a quitclaim deed; but that is not a matter I would care to take my oath upon.

" *Q.* Your recollection is not very clear upon it?

" *A.* Not very clear upon it.

" *Q.* But is your recollection to some extent, also, that the remark was that the deed would be dated back?

" *A.* No; I don't remember anything about it. As I said, I wouldn't want to swear to it.

" *Q.* Your recollection is not that he said that he had already made a quitclaim deed?

" *A.* No; he said nothing about that, as I remember of.

" *Q.* Nothing to that effect?

" *A.* No.

" *Q.* But your recollection is that he then claimed to be the owner of one-third, and also the purchaser?

" *A.* Yes, sir; that is what the understanding was.

" *Q.* Between both of you?

" *A.* As I understood it, he owned a one-third interest, as I understood it, in the land there, and foreclosed the mortgage on the other part, or the whole part, rather.

" *Q.* And he said nothing to disabuse your mind of that idea?

" *A.* No, sir.

" *Q.* And did not at any time until the deed was recorded ?

" *A.* I don't know as he ever said anything about it."

On cross-examination the testimony was emphasized :

" *Q.* Well, that day he didn't state to you personally that he owned that one-third interest; you knew that from the records in the office ?

" *A.* Yes, I think he did, Mr. Luton; I think he said he owned a one-third interest in the land, and he had bought out one of the boys. Of course I knew, when the deed came in, that was a fact anyway."

The substance of these conversations was denied by Robinson, while he and his wife and his mother-in-law, and the notary, who was a farmer and preacher, living at some distance in the country, testified to the execution of the deed at the time stated. Albert, to his credit, was not a witness, nor does he appear to have taken any part in this defense, further than by a joint answer, for which we are charitable enough to believe that he is in no wise responsible.

The most that can be claimed for this defense is that Issachar N. Robinson devised this scheme to acquire title to the premises for a low price by lulling Mrs. Ream into security by the thought that he was a tenant in common, which he knew that she believed prevented cutting off her interest, until it should be too late to redeem. He bought the mortgage for and in the name of a client, and immediately foreclosed it, though he knew Mrs. Ream was striving to pay it. He resorted to artifice, upon his own theory, to prevent redemption, for he does not deny that he omitted to inform her or her attorney of what he now says was the true state of the title. He says he was paid $100 for his title by his own son, yet within 10 days thereafter he proceeded to cut this off by foreclosure. He says he intended to deed it to him afterwards, if he should reimburse him. His wife testified that she understood about this matter, in fact drew some of the papers, and

was "particularly interested in it." She understood her son bought it as an investment. She thought they could buy out the heirs, or they could get title on foreclosure, and then deed it to him. She said: "I particularly cared to have all of the title come through us." She "didn't want her husband to give it to the boy right out, because she wanted the boy to use his own money. He had been in college, and wasn't posted in business matters, as men ought to be."

We are not impressed by the version of the alleged deeding to Albert, in preference to the more probable one shown by the testimony of complainants' witnesses. It is urged upon the part of defendants that Issachar N. Robinson was under no obligation to pay this mortgage, and had a legal right to purchase this land, and that the title so acquired would not be held for the benefit of his co-tenants, to whom he owed no duty, not having acquired his interest under the same deed, and not being in possession. There are many authorities which recognize this exception to the general rule, although others refuse to do so, and Michigan decisions are accredited with a tendency to approve the exception; it having been held that a co-tenant may, under some circumstances, assert adverse possession. But the case seems to be within the rule of *Damm* v. *Damm*, 91 Mich. 424 (51 N. W. 1069), which appears in all important respects a similar case.

The decree of the circuit court is reversed, and a decree will be entered in this court setting aside the quitclaim deed to Albert M. Robinson, declaring that the complainants and Issachar N. Robinson are the owners in fee of the premises in equal shares of an undivided third each, subject to the right of dower of Rachel Holbrook; the shares of defendant Robinson and complainant Daniel Boyden each being also subject to a lien in favor of complainant Etta Ream for the amount of $28.15; and that Daniel Boyden's share be subject to a lien for $165.20 in favor of the defendant Issachar N. Robinson; all sums to draw interest from June 5, 1900; and that the complain-

ants recover costs of both courts against the defendants; and that the cause be remanded to the circuit court to enforce said liens and partition the premises by appropriate proceedings.

The other Justices concurred.